A08A0700. LEE et al. v. McCORD et al.
(665 SE2d 414)

BARNES, Chief Judge.

Floyd Lee was diagnosed with prostate cancer and underwent "prostate brachytherapy surgery" on December 28, 2001, during which radiation oncologist Dale McCord implanted radioactive "seeds" in Lee's prostate. Lee and his wife sued McCord, McCord's practice group, Atlanta Oncology Associates (AOA), and Northside Hospital on June 3, 2005, contending that McCord committed medical malpractice by implanting the seeds in the healthy lower half of Lee's prostate instead of in the cancerous upper half. The Lees also contended that McCord acted as an agent or employee of Northside, and that he committed fraud by failing to inform Lee or his treating urologist after a test performed shortly after the surgery showed that the seeds were implanted improperly.

All of the defendants moved for summary judgment, and after a

---

[24] Id. at 166-167.
[25] Id. at 169 (4).
[26] *Tittle,* supra at 862-863.

YALE LAW LIBRARY

hearing, the trial court granted the motions. The Lees appeal, enumerating seven separate errors, several of which we have consolidated for consideration.

Because we conclude that the appellees have failed to show, as a matter of law, that Lee manifested symptoms of an injury caused by the alleged negligence more than two years before his suit was filed, we reverse that portion of the trial court's order granting summary judgment to McCord and AOA. We affirm the grant of summary judgment to Northside, however, because Lee failed to argue the issue he enumerated as error, and failed to enumerate as error the issue he argued.

To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

> When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion.

(Footnote omitted.) *Beasley v. Northside Hosp.*, 289 Ga. App. 685 (658 SE2d 233) (2008). When reviewing the ruling, we conduct a de novo review of the law and the evidence. Id.

So viewed, the evidence shows that Lee's primary care physician referred him to urologist James Libby in October 2001 to evaluate Lee's elevated PSA level of 7.1. A biopsy revealed adenocarcinoma of the prostate. Libby recommended that Lee undergo radioactive seed implantation and referred him to McCord, a radiation oncologist approved by Lee's insurance carrier with whom Libby had never worked.

McCord examined Lee in November 2001 and agreed that he was a good candidate for radioactive seed implants. A physicist employed by AOA developed Lee's treatment plan, designed to deliver the maximum dose of radiation to the prostate gland and the minimal dose to the urethra and rectum. Lee underwent the procedure at an outpatient facility of Northside Hospital on December 28, 2001. Urologist Libby assisted, guiding the needles loaded with radioactive seeds into Lee's prostate, based on the physicist's plan. Libby then left the OR and McCord placed the seeds into the prostate and withdrew the needles.

On January 14, 2002, Lee underwent an imaging scan to determine where the radioactive seeds had been placed and to

compare the actual placement to the planned placement. On March 14, 2002, the physicist reviewed the data and concluded that the implant was "not . . . ideal." The seeds inside the prostate were not placed where planned and some seeds were located outside the prostate. The physicist thought this was a "marginal case" because "approximately 50 percent of the gland was covered with 90 percent of the dose instead of over 80 percent" of the gland being covered. Lee's treatment goals were not met because "the percent of coverage and dose delivered to critical structures did not match what [the physicist] originally planned them to be." While he did not remember this case specifically, his practice would have been to send a physical copy of the report directly to McCord's office, and the record shows that McCord signed a copy of the report the day after it was produced.

McCord testified that after reviewing this report he concluded that the implant "was acceptable but not ideal." A national protocol provides that if 50 percent of the gland receives 90 percent of the dose, then it is an acceptable implant, and in Lee's case, 50.42 percent of the gland received 90.28 percent of the dose. McCord noted that Lee initially had "absolutely refused" to consider having external radiation, and so he was not happy with Lee "at all to begin with, because of the fact I don't particularly care for patients to tell me what treatment they're going to have, but . . . I did try to accommodate him." He called Lee after reviewing the physicist's report and told him he needed to come see him and have PSAs done every three months. Lee responded that it was more convenient for him to continue seeing Libby and get the tests done at a facility closer to his house. While McCord did not specifically recall calling Libby about the report, he was sure he would not have called to say the implant was unacceptable because Libby was the one who placed the needles, and because according to national protocol, it was acceptable. The proper treatment for a patient with a less than perfect implant was to follow him closely, obtain serial PSAs, and consider further intervention if the tests revealed a problem. McCord depended on Lee to obtain the serial PSA with Libby because Lee "refused" to return to him. Additionally, McCord said he would never "tell a urologist what percent of the prostate gets a certain dose. They wouldn't have any idea what you're talking about." Finally, he saw "no reason to alarm Mr. Lee because it was an acceptable implant. . . . There was no reason to alarm the patient about the fact that this was less than ideal, but acceptable, as an implant, because you can't predict" the course of prostate cancer.

Libby testified that he saw Lee on January 21 and March 18, 2002, and that a PSA test in March showed a level of 3.1, which seemed to indicate "an excellent result" from the implant and Libby

did not know that the actual radiation dose Lee received was considerably less than the targeted dose. A routine followup in June 2003 revealed a PSA of 6.7, but a bone scan that month was negative for metastatic disease. In August 2003, Lee's PSA was 6.5, but a September 2003 scan was again negative for metastatic disease. Because he still did not know about "the improper placement of the radioactive seeds within Mr. Lee," Libby said he diagnosed the PSA elevation as a "PSA bounce," not uncommon after a seed implant.

In May 2004, Lee's PSA level had risen to 9, but another scan again was negative for metastatic disease. Libby referred Lee to radiation oncologist Frank Critz, who performed an imaging scan and determined that "the area of cancer in the right base of Mr. Lee's prostate had no seeds, nor were there any seeds in the upper two-thirds of the prostate." In August 2004, Libby assisted Critz in performing a second radioactive seed implant to treat Lee's cancer and counter his rising PSA. Lee underwent a series of external beam radiation treatments a few months later.

According to Libby, in October 2004, McCord called him and agreed that the seeds had been inadequately planted in Lee in December 2001; that Lee's January 2002 post-operative study revealed the inadequate seed placement; that he never discussed the study results with Lee or Libby; and never forwarded the post-op study to Libby. Libby continued, "Upon my statement of displeasure that he did not advise me of these facts, he apologized. Further, Dr. McCord stated that he felt it was in Mr. Lee's best interest not to 'alarm' him regarding the misplacement of seeds, and thus chose not to tell him."

A board-certified radiation oncologist testified that the dose of radiation delivered to Lee in December 2001 was "considerably less than the targeted dose," and that McCord breached the applicable standards of care by improperly placing the seeds inside and outside Lee's prostate and by failing to advise Lee or his treating urologist promptly about the improper placement. While the primary cancer was located in the upper portion of his prostate, the few seeds implanted within the prostate were primarily in the lower portion, thus delivering unnecessary radiation to noncancerous healthy tissue inside and outside Lee's prostate and failing to radiate the primary location of the cancer.

Radiation oncologist Critz testified that the first seed implant in December 2001 was not done correctly. While a suboptimal implant was not necessarily negligence, if the results "deviate strongly" from the plan, "then that raises questions about the skill level" of the physician who placed the seeds. Here, Critz thought that the "people

doing the implant did not know what they were doing and they failed to cover the upper part of the prostate . . . where the cancer was located."

The record contains two almost identical post-operative reports by the AOA physicist interpreting the results of Lee's January 2002 imaging scan. One report, produced by McCord, showed that Lee's prostate volume was 28.16 cc, and that 50.42 percent of the gland received 90.28 percent of the intended dose. This is the report from which McCord testified that the implant was acceptable under the protocol of a national organization. The other report, produced by Critz along with the rest of the records he had for Lee, showed Lee's prostate volume was 27.52 cc, and that only 48.96 percent of the prostate received 90.28 percent of the planned dose. Applying McCord's testimony, a jury could conclude from this second report that the implant was unacceptable under the national protocol McCord described because less than 50 percent of the prostate received 90 percent of the radiation.

Finally, Lee testified that he spoke to McCord once after the surgery, when the doctor called him at work and asked how he was doing and if he had been back to see Libby. McCord may have said it was important for Lee to check his PSA level regularly, but he was "almost sure" McCord had not discussed anything about where the seeds had been placed or what the followup imaging scan showed. Lee experienced no significant symptoms of any sort after the surgery until 2004. While he was "shocked" when his PSA level in June 2003 was 6.7, he was reassured by Libby's explanation of a possible "PSA bounce." When asked if Critz explained the result of the 2004 imaging scan, Lee responded, "He didn't have to explain it. He showed the picture of it and you could see the prostate and you could see the lit up seeds that were in there. So that's one it didn't take a rocket scientist to figure out."

Regarding his symptoms, Lee testified that in spring 2004, he began experiencing a loss of urinary control and had his first "accident" in which he urinated on himself at work because he could not get to the bathroom on time. Mrs. Lee testified that, while Lee experienced some "dribbling" after the first implant, which they expected due to the radiation treatment, he did not experience his first serious incident of total urinary control loss until May 2004. Lee also testified that he experienced his first bowel control problem in May 2004, again at work, which Mrs. Lee confirmed. Both Lees testified that after the second implant his incontinence grew much worse. Further, although Lee had been able to maintain an erection and have sex occasionally after the first procedure, he became completely impotent after the second one.

In an order drafted by the defense, the trial court concluded that Lee alleged negligent treatment, that his "injury" occurred on December 28, 2001, and that the statute of limitation expired before he filed suit. The court rejected Lee's argument that he suffered a subsequent injury when his cancer metastasized or that this was a misdiagnosis case, granting summary judgment to McCord and AOA. The court also granted summary judgment to Northside, finding that McCord was not the hospital's agent or employee.

1. The statute of limitation on medical malpractice cases was once two years from the date of the negligent *act*, but after the Supreme Court of Georgia determined that such a law was unconstitutional because it foreclosed some causes of action before they ripened (*Shessel v. Stroup*, 253 Ga. 56, 59 (316 SE2d 155) (1984)), the legislature repealed OCGA § 9-3-71. It substituted a new statute, subsection (a) of which provided that "an action for medical malpractice shall be brought within two years after the date on which an *injury* or death arising from a negligent or wrongful act or omission occurred." (Punctuation omitted; emphasis supplied.) *Quinn v. Stafford*, 257 Ga. 608, 610 (5) (a) (362 SE2d 49) (1987).

Thus the two-year statute of limitation in a medical malpractice action begins running on the date of an *injury* resulting from the alleged negligence, not from the date of the negligence itself. OCGA § 9-3-71 (a). "[N]ot all 'injuries' are necessarily the immediate consequence of a physician's negligent" act. *Amu v. Barnes*, 283 Ga. 549, 551-552 (662 SE2d 113) (2008). If the injury occurs afterward, then the statute of limitation commences from the date the injury is discovered. Id.

McCord contends that the trial court correctly determined that Lee's claim is barred by the statute of limitation. Because this is an affirmative defense under OCGA § 9-11-8 (c), however, the burden was on McCord to come forward with evidence demonstrating as a matter of law that Lee's injury occurred and manifested itself more than two years before he commenced his malpractice suit. *Ward v. Bergen*, 277 Ga. App. 256, 260 (626 SE2d 224) (2006). McCord could "not rely upon an absence of evidence in the record disproving the affirmative defense. Thus, at the summary judgment stage, the burden was on" him. (Citations omitted.) Id.

McCord argued that, because "the only mention of Dr. McCord's care" in the complaint was the December 2001 surgery and his subsequent failure to advise Lee or Libby about the post-operative study results, Lee has admitted that all his injuries occurred during the December 2001 surgery. McCord also argues that the "injury" of which Lee complains is "the continued existence of the cancer," and that the symptoms of the continuing cancer manifested themselves more than two years before the Lees filed suit. But Lee does not

contend that he was "injured" on December 28, 2001, or that the implant should have eliminated his cancer. He contends that he was negligently treated in December 2001 and that his injuries arose subsequently when his healthy tissue was damaged by radiation, his cancerous tissue was not damaged by radiation, his cancer metastasized, and his PSA level exceeded his pre-implant level.

Although we agree with the trial court that no cause of action exists in Georgia for a continuing tort, *Young v. Williams*, 274 Ga. 845, 848 (560 SE2d 690) (2002), this case is not a continuing tort case. Nor is it a "misdiagnosis" case; Lee was diagnosed with prostate cancer, he was treated for prostate cancer, and he still has prostate cancer. Instead, it is a "new injury" or "subsequent injury" case in which Lee contends that the alleged malpractice in December 2001 subsequently caused an injury, and the statute began running when the injury arose. The misdiagnosis cases are useful in that, while they discuss an "exception" to the two-year statute, they are simply applying the basic rule that the statute begins to run when the injury occurs, which is not necessarily the same time the malpractice is committed. As Lee's is a new injury case, "the operative question is: When did symptoms of the injury caused by the [alleged malpractice] first manifest themselves to [Lee]?" *Brown v. Coast Dental of Ga.*, 275 Ga. App. 761, 767 (1) (622 SE2d 34) (2005).

McCord must establish that no genuine issue of material fact exists regarding when Lee was injured. He argues that Lee was not asymptomatic following the procedure and is thus barred from claiming a new injury. See, e.g., *Amu v. Barnes*, supra, 283 Ga. at 551-552; *Bousset v. Walker*, 285 Ga. App. 102, 104 (2) (645 SE2d 593) (2007). He also contends that the record contains no evidence Lee has incurable metastatic cancer. But some evidence exists in the record that Lee experienced no symptoms of urological or rectal incontinence until spring 2004, and the expert radiation oncologist testified that Lee's rising PSA levels indicated "within a reasonable degree of medical probability a biochemical recurrence of Mr. Lee's prostate cancer." Critz testified that he thought Lee's recently rising PSA levels were due "more likely than not" to a recurrence of cancer outside the prostate. While the evidence was not definite and Lee's short-term prognosis was fine, Critz thought that "[t]he way the PSA is going up, this probably means metastatic cancer." Due to his relatively young age of 63 in 2007, Lee "potentially has quite a number of years in front of him and prostate cancer could be fatal in his case."

"The true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result." (Citation and punctuation omitted.) *Kaminer v. Canas*, 282 Ga. 830, 833 (1) (653 SE2d 691) (2007).

In this case, if Lee had sued McCord solely because of the inadequate implant, he could only have shown speculative future damages. At that point, nothing had changed; his cancer was as it had been and his noncancerous cells had not been attacked by radiation. "A patient suffers a 'new injury' if he or she has a relatively benign and treatable precursor medical condition which . . . is left untreated and subsequently develops into a much more serious and debilitating condition. [Cit.]" *Amu v. Barnes*, supra, 283 Ga. at 552.

In this case, McCord has not demonstrated the absence of a factual issue regarding when Lee was injured. Lee was told to expect minor urinary and erectile problems following the first implant, and the record contains evidence that he did not begin to suffer complete urinary or bowel incontinence or complete impotence until well after the surgery. Affirming a jury verdict for the plaintiff, we have held that although the plaintiff "was well aware that he was suffering and would suffer from the radiation treatments, yet it cannot be said that any cause of action he had began immediately upon his suffering the side effects which his doctors had advised him would occur." *Stephen W. Brown Radiology Assoc. v. Gowers*, 157 Ga. App. 770, 773 (1) (278 SE2d 653) (1981).

A jury could conclude from this evidence that Lee was not injured from the improperly planted radioactive seeds until he began experiencing total incontinence in spring 2004. If the statute began running in spring 2004, then Lee's June 3, 2005 suit was filed before the statute ran. Accordingly, we reverse the trial court's grant of summary judgment to the defendants.

2. Lee also asserts that, even if the injury did occur in December 2001, the running of the statute of limitation was tolled because McCord fraudulently concealed his "botched treatment" by failing to tell him the results of the report showing less than optimal placement of the radioactive seeds. While we found in Division 1 that a jury question exists regarding when Lee's injury arose for statute of limitation purposes, if a jury determined that the injury arose more than two years before Lee filed suit, they would still have to consider whether McCord committed fraud that tolled the running of the statute.

Fraud sufficient to toll the statute of limitation requires:

> (1) actual fraud involving moral turpitude on the part of the defendant; (2) the fraud must conceal the cause of action from the plaintiff, thereby debarring or deterring the knowing of the cause of action; and (3) the plaintiff must have exercised reasonable diligence to discover the cause of action, notwithstanding the failure to discover within the statute of limitation. [Cit.]

*Kane v. Shoup*, 260 Ga. App. 723, 726 (2) (580 SE2d 555) (2003). "The physician-patient relationship is a confidential one and silence or failure to disclose what should be said or disclosed can amount to fraud which tolls the statute. [Cits.]" *Lynch v. Waters*, 256 Ga. 389, 390 (349 SE2d 456) (1986). For example,

> [t]he statute of limitation would not begin to run if the defendant physician had assured plaintiff that the injuries which had manifested themselves were only slight or only temporary and assured [him he] would eventually be all right, thereby inducing plaintiff to refrain from making any further inquiry into [his] condition.

(Citation and punctuation omitted.) *Padgett v. Klaus*, 201 Ga. App. 399, 399-400 (1) (411 SE2d 126) (1991).

While the fraud itself (the defendant's intention to conceal and the plaintiff's deterrence from bringing suit) must always be established, a "confidential relationship between the parties imposes a greater duty on a defendant to reveal what should be revealed, and a lessened duty on the part of a plaintiff to discover what should be discoverable through the exercise of ordinary care." *Hunter, Maclean, Exley &c. v. Frame*, 269 Ga. 844, 849 (1) (507 SE2d 411) (1998).

In this case, McCord merely advised Lee to obtain serial PSA tests, which would be standard practice following any prostate implant, but never indicated to him or to his treating urologist that any reason existed to monitor Lee more closely than usual. Because Lee underwent the imaging scan shortly after the December 2001 surgery, neither he nor his subsequent treating physicians had any reason to perform another one in the absence of signs or symptoms indicating a problem. Further, the existence of the two different reports based on the same data, one showing an acceptable implant and the other showing an unacceptable implant under McCord's testimony, constitute "evidence from which it can be inferred that [McCord] knew of his improper conduct and tried to cover up such conduct." *Quattlebaum v. Cowart*, 182 Ga. App. 473, 475 (2) (356 SE2d 91) (1987) (physical precedent only). This is buttressed by the evidence that McCord intentionally withheld this information from Lee so Lee would not be alarmed.

The record contains sufficient evidence that Lee was deterred from learning about McCord's alleged negligence to present a jury question on whether McCord committed fraud that would toll the running of the statute. "The claim . . . is not barred unless the jury should find that the action was not brought within two years from the discovery of the fraud or within two years from the time the

plaintiff should have discovered the facts in the exercise of reasonable diligence. [Cits.]" *Breedlove v. Aiken*, 85 Ga. App. 719, 721 (70 SE2d 85) (1952).

3. Finally, Lee contends that the trial court erred in granting summary judgment to Northside Hospital. In his enumeration of errors, Lee contended that "[t]he trial court erred by holding that Dr. McCord was not an agent of Northside Hospital and that the Lees did not rely on any representation that Dr. McCord was an agent of Northside Hospital." In his brief, however, Lee only argued that "these issues were not ripe because the trial court stayed such issues" by granting him an extension of time to respond to the hospital's motion for summary judgment.

An issue raised in an enumeration of error is deemed abandoned if appellant makes no argument and cites no authority regarding the issue in his brief. *Wellborn v. DeKalb County School Dist.*, 227 Ga. App. 377, 378 (2) (489 SE2d 345) (1997). Further, "[a]n enumeration of error cannot be enlarged to include other issues not made therein." (Citation and punctuation omitted.) *Hurston v. Ga. Farm &c. Ins. Co.*, 148 Ga. App. 324, 326 (2) (250 SE2d 886) (1978). Accordingly, because Lee failed to argue the issue enumerated as error, and failed to enumerate as error the issue he argued, we affirm the trial court's grant of summary judgment to Northside.

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Phipps, J., concur.*

DECIDED JULY 11, 2008 — 

*Lamar, Archer & Cofrin, Robert C. Lamar, Keith A. Pittman*, for appellants.

*Scrudder, Bass, Quillian, Horlock, Taylor & Lazarus, Jane C. Taylor, Paul E. Weathington, Charles M. Smith, Wayne D. Toth*, for appellees.